Good morning, Your Honors. May it please the Court, my name is Don Boyd, and I'm here representing Price Cold Storage and Packing Company, Inc., and Mr. Robert Price is here. He's the president of the company. This case is brought to this Court out of the Title VII, USC Section 499, in the Perishable Agricultural Commodity Act, and we submit that the trial court made two reversible errors. The first was with regard to its finding number 5, or its conclusion number 5, that Mr. Robert Brody, as a limited partner of Washington Organic Limited Partnership, was not in a position to exercise control over packet trust assets. The second reversible error we believe the Court committed was with regard to its conclusion that actually was in the reconsideration order was that Price did not properly bring before the Court in trial the argument that Mr. Brody received proceeds and should discord those packet trust proceeds because he was not a valid packet trust claimant. We believe that the standard review with regard to both of these issues is one of de novo review because there are facts in the record that talk about these things, either in the findings of fact that were first submitted or the findings in the reconsideration brief that the Court ruled on, and that the conclusions that the Court drew from those facts are erroneous, so de novo review is appropriate. I'm not quite clear on the second issue. The Court said that your argument on discord was too late. There were two bases. One basis was that the argument was first brought up on reconsideration. We believe that was an error because that was section 6 of our complaint, asked for or complained of unjust enrichment and asked for or complained of conversion or alleged conversion on behalf of Mr. Brody as well as all other defendants. That, in essence, is seeking disgorgement, that they converted packet funds for their own uses. The issue was specifically addressed in the findings at the pretrial order, basically, clerks record 66 that we submitted. Plaintiff's contention number 7, page 8, line 8, talks about conversion disgorgement. So does the issue of law number 5. What are you referring to now? This is clerks record 66. These are the pre-trial order. And it was, yeah, so we submitted these issues. Now, where in the pre-trial order are you reading from? Page 8, line 8, plaintiff's contention number 7. Page 10, line 19, issue of law number 5. Page 11, issue of law number 12. Well, let's just go back. I still don't see it, frankly. And the reason I don't, I mean, I see, I'm starting with the first one, number 7, plaintiffs will suffer irreparable harm if all defendants not required to disgorge, they call it PACA, assets received by them. And the reason I don't see it is that who received this theory that says, now I'm losing my acronyms, KBM received payment when it wasn't a proper PACA recipient because it hadn't, in effect, preserved or perfected its claim properly. Yes. I haven't found that claim before. That's the claim I think that is found by the district judge to be late in arising. And I don't find that claim here either. If you're pointing me to paragraph 7, I don't see it most prominently because the recipient of the money that you're claiming didn't properly perfect its claim wasn't a defendant in the case. Well, we believe that in the pretrial order, the pretrial order of the court says that Mr. Brody was doing business as KPN. It does not talk about an LLC structure or anything else. Also, later on, it talks about the fact that Mr. Brody is still owed $330,000 in the findings of the court. And these were findings submitted, and this is what the court found. And finally, in the testimony of the court, it indicates that, in the findings, it indicates that Mr. Brody is the one who started suing Washington Organic and everybody else to collect his money. The court is saying that Mr. Brody is the one who is doing these things. Mr. Brody did business as KPN. It does not reference an LLC structure at that point. The pretrial order, those were agreed facts that Mr. Brody was doing business as KPN, as an LLC structure. Agreed facts by their own definition say that no additional evidence should be presented at trial on those agreed facts. I mean, I see the disgorgement claim, and I guess what I thought that the trial judge was saying, and I don't know if this is correct or not, was that this is sort of a different disgorgement to a different entity and somehow thought you had a new whole new theory, I guess. Well, we believe the court relied primarily and just focused on necessarily the checks that were written to KPN. We were also discussing the issue that Mr. Brody sued Washington Organic. And the finding is Mr. Brody sued Washington Organic in state court. And he then, through that suit, a receivership was appointed of not only Washington Organic but its subsidiary company Washington Dried Fruit. Mr. Brody took the assets of Washington Dried Fruit, which from the record was submitted that basically those assets were purchased from the funds that were, quite frankly, fraudulently taken out of Washington Organic by Mr. Boulay to buy equipment, buy the rest of the things. Mr. Brody, in suing Washington Organic and basically taking and paying for it on a guarantee, taking over the secured position of the bank of Washington Dried Fruit, he then collected those proceeds. That was Mr. Brody himself acting. The court didn't make a finding with regard to that. That testimony by Mr. Hooper's testimony himself, who was the receiver, testified at trial. He argued this at trial. Basically all those things were Mr. Brody taking possession of funds of the pack of trust. We submit that also, whether it's KPN, LLC, or not, this is a special case in where Mr. Brody was an insider of the pack of debtor, the licensee. He was basically paying money to himself. I think the Court should have looked more to a piercing the corporate veil structure with regard to how Mr. Brody was acting with regard to his orchard company and not just to the bank. And understand that if, let's see, let's just say you were wrong on the Court's perception of Mr. Brody and that the Court's right in its findings. Would that still permit you, apart from that, to pursue your other theory on the disgorgement and the King Blossom separately, because that's a yet a different one of these parts of the multi-headed beast? If, as I was speaking, yes, I think the Court should have taken a look at the fact that Mr. Brody was an insider of the company that was paying money to himself, in essence. He had special control of where those funds came out of Washington Organic to pay himself or his company, his LLC. He was writing the checks that were paid to him. And those checks were made payable to King Blossom, no LLC signature, no designation such as that. And he also, by his manner of taking over the assets of Dried Fruit, which was a subsidiary and basically the pack-of-trust funds were funneled to that company, when he took over those assets, he was taking over pack-of-trust assets. The Court should have found on that basis alone, regardless of whether his orchard itself was operating. I probably wasn't too clear. Maybe it's because there's so many of these entities floating around. But let me try it again. If you are correct on the second part of your argument, that they shouldn't have kicked out the disgorgement vis-a-vis the King Blooms. Okay. Yes. King Blossom, excuse me. Yes. If you're correct on that, and it went back to the trial court. Yes. Would you still have a claim, even if the trial court kept in place its original findings about this control issue in Mr. Brody? Or would this need to look at those differently if you sued King Blossom? I think the control issue does not, per se, dictate the result of the disgorgement issue. Yes. Yes. The control issue is a second, separate, but somewhat intertwined issue, too, here. Because the control issue is a question of did Mr. Brody, in this instance, exercise enough control over the primary trust asset. And was that, by him writing checks, being a posting signer on checks, and substantially all the checks, all the way through the point, and still through the point where he knew that Price was out there, he had been writing checks to Price, and by his power to veto checks. And the evidence was presented here that if, when checks were written, if he didn't get explanations for checks, he would say, no, that check's not going out until I get an appropriate explanation for the check. He was the one person who would do that. Is that sufficient to find a person personally liable when they are in a situation of a limited partner in a partnership? That's the first impression, as far as we can tell, throughout the U.S. All the other cases have been corporate cases where you have officers and directors. Under partnership, you have general partners or limited partners. Mr. Brody basically set this company up primarily to sell his fruit. It was for his benefit. He then wanted to make sure, right up front, that the financial controls were there so, quite frankly, his money wouldn't be used wrongly. That's a very smart decision. I don't fault that. He was then defrauded, unfortunately, but he basically, when he started knowing about this and started feeling uneasy about this, had his own individual, Mr. Phil Blakely, go in and shepherd things for a year to find and make sure that the money was going properly. Basically, he states in his brief, they state in their briefing that they didn't have any reason to dispute the accounts payable ledger from Washington Organic to KBN. We submitted in the record that an accounts payable ledger from Washington Organic, September 28th, we submitted that as, I believe it's ER 10 in this case, shows that Mr. Brody's fruit was not being timely paid by months and months. This would have been evident in the summer of 2000. Interestingly, Mr. Brody admits that he was not happy with the Washington Organic operation by summer of 2000, but then the court finds that somehow he Well, we think that was error by the court. But he, they believe Mr. Brody, the problem is that Mr. Brody was still signing checks during this whole time, signed checks at the time in September and October when he, October 12th is when he knew that price was there, price as a valid packet trust payment was submitting fruit. Mr. Brody, we submit, took on the mantle of, and for the benefit of himself, of the financial controls of this company. And by taking those, that mantle on, he took on the responsibility of a packet trustee. And this is a, we believe that is the synchronon of what this court said in Sunkist's case back in 1997 when it said a shareholder, officer, or director can be found liable. It didn't say you had to be all of those or had to take on two roles, but a shareholder could be responsible if the shareholder was in a position to control trust assets and did not preserve them for proper packet trust beneficiaries. Other courts have followed along with that. The Farmway case that's cited by Hawley has been roundly rejected as basically a case saying that somehow state court, corporate law, or partnership law can shield a person from PACA trust liability if they take on the mantle of control of trust assets and don't act to preserve those trust assets. And we believe that here, Mr. Brody did not take, he took on the mantle. And then at a time when he knew price was out there, he was writing checks to anything else. Unfortunately, under PACA, it's a tough law. And at that point, if price hasn't been fully paid, he is subject to personal liability because he was allowing proceeds to go out to admittedly, you know, good, normal business purposes. But once you take on that mantle, you are subject to that problem and a personal liability coming back. I would like to reserve, if there are no other questions, I would like to reserve the rest of my time for rebuttal. Good morning. May it please the Court. My name is Tom O'Connell. I represent the defendant respondents in this matter, Bob and Charlotte Brody. Briefly, I'd like to review what I believe are pertinent court findings that I believe are controlling on the issues in this case. Mr. Brody was a limited partnership, a limited partner in Washington Organic, which was formed in May of 97. And the purpose of that was that partnership was to sell Mr. Brody's organic fruit, and that fruit is sold under the King Blossom Natural label. As a full-time orchardist, Mr. Brody had little time to be involved in the marketing of his fruit. As indicated in the briefing, he worked anywhere from five to seven days a week up at his orchard up in Okanagan County. What he did do is he set the price that the King Blossom Natural fruit should be sold for and the time that it should be sold. Mr. Brody learned that if he held his fruit out until the very end, he would usually be able to make more money. He also co-signed checks that were prepared at the direction of Mr. Boulay, who was the general partner in the partnership. As a sole proprietor, Mr. Brody marketed his 97 and 98 crops through Washington Organic. In January of 99, Mr. Brody formed the King Blossom Natural LLC, and the 99 crop was also marketed through Washington Organic. Mr. Boulay, the other defendant in this case, the general partner, the court found controlled the day-to-day operations of Washington Organic, including how the money flowed in and out. Mr. Boulay also took steps to make sure that the limited partners were kept in the dark as to what was going on in 1999 and 2000. Specifically, in late 1999-2000, without his partner's knowledge or consent, he created a new label, not the King Blossom Natural label, but a new label, a new sticker that was called Washington Organic. He also went out and solicited and contracted with other companies to sell their fruit, including Price. And he was the one that signed the contract for that. None of the limited partners signed it, and the evidence was that they weren't even aware of this. Between September 11th of 2000 and December 2000, Mr. Boulay marketed Price's fruit under this new label, the Washington Organic label. It wasn't under King Blossom Natural. And also the evidence established from April to December 2000, Mr. Boulay, with the assistance of his hand-picked bookkeeper, Linda Steele, who the evidence established was a convicted embezzler. She had stolen from her prior employer. They proceeded to make multiple wire transfers between April and December of 2000 of approximately $300,000 out of the Washington Organic account. The judge also found that both Price and Mr. Brody's company were victims of Mr. Boulay's fraud. Washington Organic failed to pay King Blossom Natural LLC over $400,000 and failed to pay Price a little less than $200,000. So then we turn to the issue of disgorgement in this case. The argument that is being made is that the pretrial order and then the subsequent written findings indicated that Mr. Brody was, in fact, operating as a sole proprietorship and that the plaintiffs had the right to rely on that, and thus Mr. Brody should disgorge funds that were received by the third-party entity, King Blossom Natural LLC. The response to that is in CR 73, in the excerpt of records, October 7th of 2003, five and a half months prior to trial, plaintiff's counsel took Mr. Brody's deposition, and in relevant part it stated, question, do you own your own business? Answer, and the answer is by Mr. Brody, the bank and I. Question, okay, and what is the name of that business? Answer, it's called King Blossom Natural. Question, is that a corporation? Answer, it's an LLC. Question, okay. So as of five and a half months prior to trial, under oath, Mr. Brody disclosed to the plaintiffs that he was operating as an LLC. Now, on February 27th of 2004, I had forwarded to plaintiff's counsel the proposed pretrial order, and it was a rough draft. It left the facts of the contention section blank. In March of 2004, I received back from plaintiff's counsel their proposed pretrial order, and because the filing deadline of that pretrial order was fast approaching, what we discovered happened is my staff scanned the plaintiff's order onto our pleading paper, and that's what was submitted. Plaintiffs rely on paragraph 24 in that pretrial order, and what that language says is that D. Robert Brody is an NCW North Central Washington orchardist doing business as King Blossom Natural. Paragraph 25 then states, for 1997, 1998, and 1999 crop years, King Blossom Natural supplied varieties of apples to Washington Organic on consignment. For 1997 and 1998, that is accurate. Mr. Brody was operating as a sole proprietorship. However, in January of 1999, as indicated, Mr. Brody formed an LLC of his orchard operations. During trial, plaintiff's counsel, on cross-exam of Mr. Brody, again asked as to the form of his entity. Question, and this is in EOR 16. Question, do you operate the orchard under a trade name? Answer, King Blossom Natural LLC. Question, okay, when did it become a limited liability company? Answer, 90, I believe, 1999. Question, okay, prior to that time, did you operate as a sole proprietorship? Answer, yes, I did. In the district court's oral decision, which is EOR 23, the judge repeatedly differentiated between King Blossom Natural, the sole proprietorship, and King Blossom Natural as a limited liability company. Yet at no time did Price move to join King Blossom Natural LLC as a party or amend its pleadings, ask for a trial continuance, or seek additional discovery. Instead, the tactic they're taking is that they want Mr. Brody to personally discourage proceeds that he didn't receive. And how do they make that claim? By claiming the district court found that Mr. Brody was doing business as King Blossom Natural. Well, if you look at the written findings, CR 76 at page 3, the findings state, in January of 1997, Robert Brody, DBA, King Blossom Natural, North Central Washington Organic Orchardist, was approached with the idea of forming a marketing agency, et cetera. That finding is true. In January 1997, Mr. Brody was operating as a sole proprietorship. It wasn't until January 1999 that he formed the LLC, and Judge Succo orally found that during 1999-2000, King Blossom did operate as an LLC. An important point, Your Honor, it's indicated in page 7 of the reply brief of the plaintiffs or the appellants. Plaintiffs' counsel admit in the reply brief that they intentionally, quote, unquote, intentionally placed in their order language that King Blossom Natural was the sole proprietorship, though they knew otherwise. They knew five and a half months before trial that it was a limited liability company. They also claim in their brief that they were under the impression, quote, unquote, under the impression that Mr. Brody was at all times operating as a sole proprietorship. We would submit that argument is unbelievable, given the fact Mr. Brody twice testified under oath that he was a limited liability company as of January 1999. And the reason that the date is important is because the plaintiff's complaints in this case arose in September of 2000, 20 months after Mr. Brody had formed the limited liability company. How counsel can argue in good faith that they had the right to rely on a fact that they knew was incorrect is beyond me. If they didn't believe Mr. Brody's testimony, they could have simply made a call to the We would submit on that issue it would be manifest injustice if Mr. Brody was ordered to discourage funds that he personally never received when there is substantial I just ask you, I understood maybe, I don't understand correctly, that the district judge didn't deal with the discouragement issue on the merits because he said it was  He didn't, Your Honor. And in fact, that's the other argument. And I think counsel indicated he felt that that was a de novo review. I would submit that if that evidence, if that finding of fact was not made and requested, it would be an abuse of discretion standard. But what happened there is that I wanted to ask you, why do you say that the discouragement issue, I'm not saying about the merits of it, there may be no merit to the discouragement issue. It may be that the record is clear that Mr. Brody was in a limited partnership and he was not operating as an individual and there's just no merit to the claim. But wasn't the claim made in the final argument to the court? As you say, it does appear on the face of the pretrial statement. Then in the final argument, Mr. Boyd talks about being with Mr. Brody and King Blossom, and then the court says, doesn't that get us back to the limited partnership issue? And he says, I think they're different issues. That's an additional avenue upon which the court can find personal liability. Here, Mr. Brody was taking funds wearing his King Blossom natural hat, and he's accepting these proceeds. He says, again, I'm not suggesting there's merit or not merit to it, but isn't it raised or wasn't it presented to the court there? Well, I think the response by Judge Succo was, was that the issues that were before the court through the entire trial were whether under PACA, Mr. Brody was liable for overstepping his authority as a limited partner, or alternatively, that he exercised some control that put him in a position that he would be secondarily liable. And the court said that when counsel brought up after the court's oral ruling, they asked that a finding be made that whether King Blossom natural was a valid PACA claimant. At that point, Judge Succo indicated he had two problems with that. One, disgorgement was not an issue in the case, and there weren't sufficient facts, testimony presented on that. I mean, yes, there was at the closing argument Mr. Boyd brought up, which from the first time from my perspective brought up this disgorgement claim, but there were no facts, no testimony to substantiate that. The other issue that Judge Succo had was that even if that was brought up, it would have to be against King Blossom Natural, LLC, because that was the company that received the proceeds. And King Blossom Natural, LLC was not a party to the case. And that's why the court refused to enter that finding, Your Honor. The other ---- To your point about Mr. Brody's role, I'm wondering why, if he had this authority to ---- well, requirement to co-sign the checks, and he, in effect, exercised what was a financial veto, sometimes he would sign the checks and sometimes he wouldn't, and he would refuse to sign the checks, why that isn't tantamount to control of the assets, the trust assets? Well, there's a couple points, Your Honor. One is, first, I think the two primary arguments that Plaintiffs have of control is, one, that Mr. Brody controlled the sale price and the timing of his fruit. And, in fact, there is evidence in the record that Plaintiffs' President, Mr. Price, also had those same controls as to when he wanted his fruit to be sold and the price he wanted it to be sold by Washington Organic. Mr. Price isn't a limited partner in Washington Organic. In fact, the evidence was that's very common in the industry. The growers, they're the ones that determine what they want the price to be, and if the marketing entity can't get it ---- But Mr. Price is not in a position to decide who gets paid by Washington Organic and who does not. And what happened there was there was a business decision when the partnership was formed that, obviously from a protection standpoint, that there should be two signatures on checks. And the checks that were presented, as the evidence indicated, all the documents that were provided to Mr. Brody at these meetings, they were Friday meetings, usually lasted a half hour, related to King Blossom Natural fruit sales. The evidence before the court was that there was no evidence presented to Mr. Brody that any other marketing of any other fruit was going on. There was evidence presented that on occasion Mr. Boulay would have to fill an order. So Mr. Brody had a lot of Golden Delicious apples, but he didn't have any Fuji apples. Well, what would happen is that Mr. Boulay had the authority to go out and actually pay for a load of those different apples. And that's different than a consignment arrangement. A consignment arrangement, which is involved with Mr. Brody's fruit and Price's fruit, is that the marketing entity doesn't take ownership of the fruit. They simply market it. In the case of buying apples to fill an order, it's not a consignment arrangement. They are taking ownership. They pay them right then and receive the funds back. Well, doesn't the fact that there were checks, I've now forgotten the number, but there were checks paid to plaintiff, could your client have understood those to have been in a consignment arrangement? They're not payments being made on the spot. They're apparently being made after the fact. So it suggests a consignment arrangement rather than it going out and making a spot purchase of apples. Except the evidence before the court was that Mr. Brody only signed three checks. There were multiple checks, in fact, that were sent to Price, but Mr. Boulay was the only one that signed the other checks. Mr. Brody signed three checks, and the evidence before the court was that Mr. Brody on each of those three occasions specifically asked what are these checks for, whose price, and was told that they had to fill an order and they had fruit that a customer wanted that Mr. Brody did not have in his orchard. And so they simply, these were payments for filling an order, that it was not a consignment arrangement. There was no evidence that they were operating under a new label and they had a new contract with all of these other companies. Mr. Brody always understood that the only fruit that was being sold on a consignment arrangement was his fruit. I mean, that's why this marketing entity was set up. Mr. Boulay then went off on the side and tried to cut a deal where he could make more money and sell other people's fruit. But that sort of begs the question as to whether his authority with respect to signing and deciding what to sign, obviously he couldn't do it if it wasn't presented to him. But what the court found, though, the distinction was, was that all of the bank records were provided in the control of Mr. Boulay. The decision what checks to cut and when to cut were all done by Mr. Boulay. The only thing that Mr. Brody had control of as he's presented these checks is told you need to sign these because we've got this obligation to co-sign checks. And he would ask, well, what are these for? And then more of the fact that Mr. Boulay might have had additional authority doesn't mean that Mr. Brody didn't have authority. In other words, it's not mutually exclusive. And my question is, if he, Mr. Brody, had a required second check authorization, why isn't that exercising control over the trust assets? The reason I would submit the reason in this case is because Mr. Brody was excluded from the relevant information that he would need to be able to have determined whether funds were being properly dispersed or not. Again, the court found, based on all the evidence, that Mr. Brody and his other by Mr. Boulay. And obviously, he would do that. But that's an odd thing to say. That seems to me it's like saying, well, you actually have control over the trust assets. But, of course, if I defraud you, I'm not going to tell you about the things you don't know. And, therefore, all of a sudden you now don't have control. That just seems like an odd argument. It seems to me if by your authority you have control, the fact that your partner deals you down the river doesn't somehow change. I guess the problem is, is does control, does it rise to the level of control simply by having an obligation to co-sign a check? And that almost turns us back. He had not only an obligation. He had a each check must be co-signed, but he didn't have to sign each check. In other words, he vetoed sometimes. Right. But, in fact, many checks were never co-signed because Mr. Boulay went ahead and submitted them on just his own signature. And, in fact, all the wire transfers were just on his signature. So Mr. Boulay didn't even follow the procedures of the limited partnership. Right. Because he's dealing. He's double dealing. Right. But if he had done that, and then Mr. Brody had authorized and signed off on all of these other checks, at that point, then the question is, is did he exercise control of that? This is where I get your argument, Fred. It's basically because if your partner is selling you down the river so he doesn't do what he's supposed to do, that somehow changes your status of control? No. As a matter of law? No. Because, I mean, obviously that's a factor. But in this case, when an individual is at the office for a half hour each week to basically pick up his check for his King Blossom natural fruit, that was the intent, and to sign checks for expenses, that in and of itself, I would submit, does not raise the level that you are exercising control of the company or of the business, such as Mr. Boulay. The case law is clear that there must be some, the individual, to be secondarily liable, must have exercised some role in causing the breach. And the cases that were cited by Plano, Sunkist Growers' case, that was on page 14 of their brief, the only issue addressed by the federal court was whether a subsequent PACA claim against the individual shareholder, officer, and director was barred by an earlier state court action against the corporation. The court never addressed what constitutes patrol for purposes of secondary liability. In Red's Market case, cited by Plano's authority, the individual defendant stipulated that they controlled the trust assets and were responsible for all aspects of the company. And in Goldman Hayden case, also page 14 cited by the Plano's, the broker-dealer went bankrupt, and the sole principal shareholder, officer, and director of the company, the court found had absolute control. Here it's undisputed Mr. Boulay controlled Washington Organic, and he was the actor responsible for the failure to preserve the trust assets. You know, and most egregiously, he intentionally transferred the assets to defraud not only his limited partners, but plaintiffs and other companies that he was selling their fruit. So whether or not the Washington Limited Partnership Act is controlling or not, the fact of the matter is no court has ever imposed liability on a limited partnership under these circumstances. We believe the evidence says Mr. Brody did not exercise sufficient control to be responsible under these circumstances. Plaintiffs do have a judgment already against Mr. Boulay. I mean, he stipulated to it. And they have judgments against the rest of the entities as well. I don't believe that under these circumstances that should impose liability on Mr. Brody, and the trial court agreed. Any questions? Thank you. Thank you, Ken. Thank you. Thank you, Your Honors. I'd just like to make a couple points with regard to the discouragement issue. I think the trial court did err in not making a finding that or a conclusion of law with regard to it in the trial order. And I think the court erred in saying that it was not brought up at trial. It was we believe it was brought up all along. And so the issue should be remanded to the court to make findings. And we believe that at that point the finding that the court did make that Mr. Brody himself sued Washington Organic, sued Washington Dry Partnership, and through the record indicated that he was the one who received the assets of those companies. Limited assets were left after receivership from the secured claim of the bank. That, in essence, are all PAC assets. And that finding should be made and therefore lead to the conclusion that Mr. Brody should discourage those proceeds. With regard to the control issue, I believe that this Court was correct in the Sunkist case when it said a shareholder, officer, or director who has exhibited ability to control and does not control trust assets and does not preserve them for PACA trust beneficiaries can be found personally liable. Mr. Brody, we submit, did put himself in that position for his benefit. He wanted to sign checks because he wanted protection, the financial protection of the company that that created. He knew of the occasional odd lot of third-party fruit that had to come in to make a full load because he did not bring in records. He knew that going along the case. We submitted that as Excerpt of Record 3 at page 22, line 4, page 26, line 4. Those are my specific questions. Mr. Brody, it direct cross-examination or direct, I'm not sure which, but I specifically asked him if he knew that occasionally they'd bring in third-party fruit to set up the issue that, yeah, that occasionally would happen. PACA trust arises automatically upon any perishable agricultural commodity being sold, and it stays there until suppliers are paid in full. At any time, Mr. Brody knew that that would occasionally occur. Any time that happened, he wasn't surprised by it. There were questions about what it was for and things like that, but that PACA trust was created by signing checks, co-signing checks. We submit that that is a synchronon of personal liability that all the cases have talked about. Cases that have been decided here before, quite frankly, Your Honors, are easy cases. They are corporate officers, directors, sole shareholders, people in day-to-day control. This is a tougher case, and we acknowledge that, but we believe that all those cases are leading to this focal point. In fact, there have been a few cases decided since the briefing in this case that have talked about this, and all of them follow the trend of the law that this Court started with its Sunkist decision as the first circuit court decision on this regard. Innocent breachers are still subject to personal liability. That's the Morris O'Koone case in the Southern District of New York, which actually the first case, I believe, that really talked about this particular personal liability issue. It said even instant breaches of trust or omissions to act to preserve the trust can cause personal liability. After Mr. Brody signed checks to Price, he knew that there was a PACA trust available or should have known. He could have gone. He could have checked to find out if there was a continuing trust obligation there. And he was signing checks, so he knew Price was there. He was signing checks to himself. He was signing checks for normal business purposes. All of those, even if those are legitimate business purposes, are violations of the PACA trust because they are using trust proceeds because it's all of the assets, accounts receivable of Washington Organic at that time, that were trust assets and should have been used to pay Price first. We are very sorry Mr. Brody lost money, but he, as an insider of the company, knew that Washington Organic was in a much better position to protect himself and to protect others than Price was, an outside supplier. Therefore, we believe that the court should reverse the trial court's finding that Mr. Brody did not have sufficient control and rule in Price's favor. Thank you, Your Honor. Thank you, counsel. Case just argued will be submitted. The court will stand in recess for the day. All rise. This court is adjourned.
judges: Reinhardt, McKeown, Clifton